### In re GRIFFIN TRADING COMPANY, Debtor.

#### No. 98 B 41742.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

July 3, 2001.

Order modifying opinion in
part July 18, 2001.

David N. Missner, Janice L. Duban, Piper Marbury Rudnick & Wolfe, Chicago, IL.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This matter comes before the Court on (1) the Chapter 7 Trustee's motion to approve a settlement agreement with certain creditors, authorize an interim distribution, and allow claims under 11 U.S.C. § 503(b)(3)(D); (2) the Joint Liquidators' cross motion to amend informal claims; and (3) the Group A English Creditors' motion to allow informal proofs of claim.

The "Joint Liquidators" opposed the Trustee's motion on the grounds that the agreement is not in the best interests of the creditors and the estate, and excludes from distribution the claims of more than eighty English creditors.

The Joint Liquidators also moved that their submissions be considered as informal claims subject to amendment so that the English creditors share *pari passu* in any distribution. In the alternative, the Joint Liquidators requested that this

Court find that the bar date does not apply to English creditors.

The Group A English Creditors filed a motion to allow certain documents to stand as informal claims.[1] Jamie Macleod, an English customer creditor, joined in the Joint Liquidators' cross-motion to amend informal claims and in the Joint Liquidators' opposition to the Trustee's motion to authorize the settlement agreement. Other creditors, Fortis Bank (Nederland) N.V. F/K/A Meespierson N.V. ("Fortis Bank") and Mark J. Walsh, Eva Walsh, and Mark J. Walsh Global L.P. (the "Walsh Claimants") opposed the Joint Liquidators' motion to amend the informal claims and the Group A English Creditors' motion to allow informal claims. The Walsh Claimants also objected to Jamie Macleod's joinder in the Joint Liquidators' motion.

At trial, the Court dismissed without prejudice the Joint Liquidators' claim against the Trustee for a breach of fiduciary duty because it was not filed as an adversary complaint.

After examining the evidence and each party's submissions, this Court concludes the following: 1) the Trustee's motion to authorize the settlement agreement is granted in part and denied in part; 2) the Joint Liquidators' cross-motion to amend informal proofs of claim is denied; and 3) the Group A English Creditors' motion to allow informal claims is denied.

## FINDINGS OF FACT

### Stipulated Facts

1. On December 30, 1998, Griffin Trading Company (the "Company" or the "Debtor") filed its petition for relief under chapter 7 of title 11 of the United States Code. Thereafter, Leroy Inskeep was appointed Trustee.

2. The Debtor was a commodities broker. The Debtor had offices in Chicago and London, England.

3. The Debtor's creditors principally consist of customers, as that term is defined in Section 761(9) of the Bankruptcy Code, and general unsecured creditors.

4. The Debtor conducted business beginning in 1993 at its London office, where it had substantial assets and liabilities.

5. On January 5, 1999, this Court (on the Trustee's motion) authorized the Trustee to issue a winding-up petition in England and Wales. The UK Court authorized the appointment of Finbarr Thomas O'Connell and Michael John Andrew Jervis, both of Grant Thornton in London, a firm of chartered accountants, as the joint provisional liquidators with respect to the Debtor's affairs in the United Kingdom ("UK").

6. On February 17, 1999, the UK Court made a winding-up order, and the following day, Finbarr Thomas O'Connell and Michael John Andrew Jervis were confirmed as full Liquidators in the UK ancillary proceeding (the "English Proceeding"). By order of the UK Court dated October 13, 2000, Mr. O'Connell was replaced as a Joint Liquidator by Ipe Jacob, also of Grant Thornton.

7. The Debtor's English operations were regulated by the Securities and Futures Authority (the "SFA") in England, and Debtor held an account with (and cleared through) the London Clearing House (the "LCH").

---

1. "Group A English Creditors" include: Giles Cameron, Beatrice Cameron, Brent M. Coan, F. McCoy Coan, William R. Collins, Jr., Chicago Urban Mission Foundation, Gaylord Coan Grandchildren's Trust, Daniel Hoellerich, J & B Marketing, Egbert Lowery, Power Capital Group and Timothy Wrinn.

8. One of the principal assets under the control, but not ownership, of Debtor's London branch was money received from or on behalf of customers ("Segregated Customer Funds"). Under the rules of the SFA, such funds must be segregated from the Debtor's other funds and are not property of the Debtor's ancillary estate. In addition, under English law (as under § 766 of the Bankruptcy Code), customers are entitled to a priority distribution of Segregated Customer Funds, subordinate only to the costs of administrating the Segregated Customer Funds.

9. In the case of the Debtor, it was apparent that the Segregated Customer Funds would not suffice to satisfy the English Customer Claims. Therefore, the Trustee and the Liquidators agreed that the Liquidators would make whatever distributions of the Segregated Customer Funds to English Customer Creditors they were required to make under English law, and any shortfall to English Customer Creditors ("Deficit Customer Claims")— plus all trade claims of English Trade Creditors—would be sought in the main U.S. proceeding. Those claims would rank *pari passu* with other like claims.

10. May 11, 1999 was the bar date for filing proofs of claims with this Court (the "Bar Date").

11. According to the Certificate of Service (Joint Exhibit 3), in early January, 1999, Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors and Deadlines was served on some 676 creditors and other parties in interest of the Debtor, including various persons in England. The Notice stated that "[P]roof of claim must be *received* by the bankruptcy clerk's office by … May 11, 1999." (emphasis in original)

12. As noted above, the Debtor's creditors principally consist of customers as that term is defined in 11 U.S.C. § 761(9)

and general unsecured creditors. Fortis Bank is the Debtor's largest non-customer unsecured creditor. It filed Claim No. 76 against the Debtor in the amount of $4,757,674.58. The Walsh Claimants are the Debtor's largest customer creditors. They filed Claim Nos. 21, 22 and 23 in the amounts of $1,016,990.80, $2,279,828.10, and $80,402.07, respectively. As of October 16, 2000, customer claims (including claims that are subject to objections that have not yet been resolved) that were actually filed before the Bar Date totaled $1,857,995.88 after adjusting for customer property paid to such creditors by the Joint Liquidators. As of October 16, 2000, unsecured non-customer claims (including claims that are subject to objections that have not yet been resolved) that were actually filed before the Bar Date totaled $6,142,877.83. As of October 16, 2000, there were 17 unsecured claims filed in the amount of $564,995.71 in this case after the Bar Date.

13. In early 1999, the Joint Liquidators were aware that some English creditors had received a notice of the Bar Date in this case.

14. In February, 1999, Mr. O'Connell, Robert Cundy and Michael Tappin (of Grant Thornton) and Messrs. Inskeep and Missner and Ms. Duban had one (or more) telephone conversation(s) during which they discussed various matters regarding the administration of these estates.

15. On February 4, 1999 (at 7:40 p.m. London time and 1:40 p.m. Chicago time), the Joint Liquidators faxed to Trustee a draft of a report to English Creditors (Joint Exhibit 6) that stated in part:

> I am aware that a notice has been sent by the U.S. trustee advising that a meeting of creditors will be held in Chicago on 10 February 1999 at the offices of

Rudnick & Wolfe. This notice also requests that all clients submit details of their claim against GTC to the trustee. The deadline set for submitting claims is as per the notice, i.e., 11 May 1999. I have recommended to those clients that I have spoken to that they should submit details of their full claims to the trustee and I will be speaking to him on this point specifically in the next few days.

16. On February 5, 1999, before receipt of the final report to English creditors from the Joint Liquidators, Mr. Missner faxed a letter to Mr. O'Connell (Joint Exhibit 8) responding to his draft report to English creditors.

17. On or about February 5, 1999 (at 7:23 p.m. London time and 1:23 p.m. Chicago time), the Joint Liquidators faxed a revised report to Trustee and Mr. Missner (Joint Exhibit 11), which changed the language relating to claims and stated, in part:[2]

> I have had discussion with the U.S. trustee and, notwithstanding the notice sent by the U.S. trustee to all creditors, he has agreed that creditors in England may submit their claims to English liquidator. It is, therefore, intended that, as soon as a liquidator has been appointed, he will write to all the English creditors inviting them to submit their claims to the English liquidator for agreement. Creditors who have already submitted their customer claims to me, and whose claims are accepted, will not need to submit further details of their customer claims. Once all the English claims have been settled, they will be transmitted by the English liquidator to the U.S. trustee in order to participate in distributions in the U.S. bankruptcy in accordance with their rankings in the U.S. bankruptcy.

18. The meeting of creditors pursuant to § 341 of the Bankruptcy Code was scheduled for February 10, 1999, in Chicago. Accordingly, Mr. O'Connell and Mr. Tappin traveled to Chicago to meet with the Trustee on February 9, 1999. Peter Fidler of Stephenson Harwood (an English law firm acting for the Joint Liquidators) traveled separately to Chicago. He arrived at the February 9, 1999 meeting approximately 1½ hours after it began. David Missner and Janice Duban (counsel for the Trustee) were also present at the February 9, 1999 meeting.

19. By motion dated April 6, 1999 (Joint Exhibit 37), the Trustee moved to make an interim distribution to customer creditors. The Trustee sought this Court's approval of the Trustee's intention to distribute funds to customers. Fortis Bank opposed the motion, principally on the grounds that the Debtor sought to accord priority status to customer creditors (wherever located).

20. On February 25, 2000, this Court entered a Memorandum Opinion and Order denying the Trustee's motion to make an interim distribution to customer creditors, in which the Court found that 17 C.F.R. § 190.08(a)(1)(ii)(J) (which provided for priority of payment to customer creditors from all assets of the estate) was unenforceable.[3] On March 6, 2000, the Trustee, the Commodities Futures Trading Commission and certain other parties filed a timely notice of appeal from that Order. Fortis Bank filed a cross-appeal on certain issues. That appeal is presently pending in the United States District Court for the Northern District of Illinois.

2. See n.5, infra.

3. See In re Griffin Trading Co., 245 B.R. 291 (Bankr.N.D.Ill.2000).

21. The Trustee, Fortis Bank and the Walsh Claimants engaged in lengthy settlement discussions. On October 27, 2000, Fortis Bank, the Walsh Claimants and the Trustee, subject to Court approval, entered into a settlement agreement (the "Settlement Agreement"), a copy of which was attached to the Trustee's Motion as Exhibit A and was admitted into evidence as Trustee's Exhibit 89. The key provisions of the Settlement Agreement are:

a. The Trustee shall distribute an amount of not less than $2,025,000 to customer creditors and non-customer creditors who actually filed their proofs of claim with this Court prior to the Bar Date.

b. Fortis Bank, upon entry of an order approving the Settlement Agreement and satisfaction of the other conditions contained in the Settlement Agreement, shall consent to the entry of an order which subordinates with prejudice fifty per cent (50%) of its filed claim against the Debtor's estate. Fortis Bank's agreement to subordinate fifty per cent (50%) of its claim does not subordinate its claim to the unsecured, subordinated claims of Roger S. Griffin and Farrell J. Griffin and does not subordinate its claim to the claims of unsecured creditors that would be entitled to distributions only under 11 U.S.C. § 726(a)(3), (4), (5) or (6). Harris Bank has agreed to the same treatment for its three claims (Claim Nos. 79, 80 and 81) which total $780,600.80.

c. The Settlement Agreement provides for the creation of an estate reserve for litigation claims in the amount of $350,000. The Trustee has agreed to select counsel acceptable to Fortis Bank to prosecute claims and causes of action against Tullet and Toyko (Futures and Trade Options) Limited and related parties. The Trustee has agreed to retain counsel acceptable to the Walsh Claim-

ants to prosecute claims against the Debtors insiders, including Roger S. Griffin and Farrell J. Griffin.

d. The Trustee shall provide Fortis Bank and the Walsh Claimants with a release of any and all claims which the Trustee, on behalf of the Debtor and its estate, may hold against either of them. The Walsh Claimants and Fortis Bank also have agreed not to assert any claims against the other arising from or related to the Debtor.

e. The Trustee, Fortis Bank and the Walsh Claimants will seek to dismiss the pending appeal from the Bankruptcy Court's February 25, 2000 ruling in a manner which is acceptable to the CFTC.

22. The approval and implementation of the Agreement is subject to a number of conditions, including that total allowed priority unsecured claims not exceed $30,000, total allowed customer claims not exceed $2,419,268.72 and total allowed non-customer claims not exceed $3,368,601.78. The calculation of total allowed non-customer claims expressly excludes that portion of Roger S. Griffin's claim which is subordinated to the claims of all other creditors and that portion of Farrell J. Griffin's claim which is subordinated to the claims of all other creditors. It also assumes that Harris Bank will agree to subordinate its three claims in the same manner as Fortis Bank and Harris Bank has agreed to do so.

23. The Settlement Motion seeks to bar English Creditors who did not file formal proofs of claim with this Court from sharing in the proposed interim distribution.

24. The Settlement Agreement of which the Trustee seeks approval is premised on the fact that the total amount of allowed customer claims is $2,419,268.72,

and the total amount of allowed non-customer claims is $3,368,601.78. Neither figure includes all of the claims of English Creditors.

25. The Opposition is a core proceeding within the meaning of 28 U.S.C. § 157(b).[4]

*Additional Court's Findings of Fact*

26. On January 28, 1999, Mr. O'Connell (the former lead Joint Liquidator) faxed a letter to the Trustee asking whether the Bar Date was the final date to file claims against the estate. (Joint Exhibit 4, p. JL00419). The letter stated:

> Please advise whether the deadline set for receipt of claims is final and all claims received after that date will be excluded. I should also be grateful to receive a sample of any standard letters sent to London Branch customers for my file.

The Trustee did not respond.

27. None of the witnesses testified as to any specific language whereby the Trustee or his counsel stated prior to the Bar Date that no English Creditor need file a claim and that the Trustee would file claims on behalf of the English Creditors.

28. Mr. O'Connell testified that the Trustee and the Trustee's attorneys agreed through a series of conferences that the English Customer Creditors could submit their claim forms to the Joint Liquidators instead of the Trustee. The agreement allegedly took place over a period of several days in February 1999. Mr. O'Connell testified that the discussions leading up to the agreement began on January 28, 1999 when Mr. O'Connell faxed a letter to the Trustee requesting advice on "whether the deadline set for receipt of claims is final and [whether] all claims received after that date will be excluded." (Joint Exhibit 4). Mr. O'Connell testified that he did not receive a response to his query, but that this letter began the discussions that led to the alleged agreement between the Trustee and the Joint Liquidators.

29. On or about February 4, 1999 Mr. O'Connell mailed the letter reflected in Joint Exhibit 11 (See ¶ 17, *supra*) to the English Customer Creditors.[5]

30. The Joint Liquidators were under the impression that the Trustee had agreed to file claims on behalf of the English Creditors. At trial, the Trustee's Counsel, Mr. Missner and Ms. Duban, adamantly denied ever having made such an agreement which would circumvent the provisions of the Bankruptcy Code. No one testified as to any such actual statement by Trustee or his Counsel. The Court finds both the Trustee's counsel and the Liquidators' testimony to be credible.

31. The language and the cultural barriers dividing the parties greatly contributed to the confusion. The Joint Liquidators' contention that an agreement took place and the Trustee's unequivocal denial that such an agreement occurred were the result of a serious misunderstanding between the U.S. and U.K. practitioners.

32. The Trustee and the Liquidators attributed different meanings to the term "schedules in bankruptcy". The Trustee's counsel testified that he told the Joint Liquidators numerous times that he needed the names and addresses of the creditors so that he could file schedules in

---

4. The word "Opposition" as used in the parties' "Stipulated Facts" is obviously a typographical error. The Court assumes the wording should be "The Joint Liquidators' Opposition to the Trustee's Motion."

5. The letter was offered and admitted solely to demonstrate the acts taken by the Liquidator, but not as proof of the content thereof. (*See* Transcript, Vol. II, p.38).

bankruptcy. Mr. O'Connell's testimony is evidence that the Joint Liquidators may have thought that the terms "schedules in bankruptcy" and "proofs of claim" were synonymous:

> Q. Prior to your involvement in Griffin, had you ever heard the term "schedules in bankruptcy"?
>
> A. No.
>
> Q. In British liquidations, are schedules ever prepared and filed with the court?
>
> A. You have to file all of the claim forms at the end of the case.

(Transcript, Vol.II, p.136).

It is possible that the Trustee told the Liquidators that he would file the schedules and they thought that he meant he would file claims on behalf of the English Customer Creditors.

33. There was also some confusion regarding the Trustee's relationship with the Joint Liquidators. The Trustee's counsel, Mr. Missner, testified that in early 1999 he thought that the Joint Liquidators were assisting the Trustee in the U.S. proceeding. (*See* Transcript, Vol. I, p.20). Mr. O'Connell, however, was never under that impression. In January of 2000, he wrote to the Trustee that from the moment he was appointed Joint Liquidator he was "bound to act only in accordance with English legislation and [his] ethical guide and [he] could not have followed any instructions from [the trustee] that would have contravened those guidelines." (Joint Exhibit 62, p.1).

34. Mr. O'Connell testified that, under English law, claims are submitted to the Liquidators rather than filed with the Clerk of Court, and are submitted to the court only with the final winding up report. He also testified that he was unaware of the requirement under U.S. law that the

claims be filed with the bankruptcy court prior to the bar date.

35. The Joint Liquidators provided Joint Exhibits 14, 18 and 19 (the "February schedules") to the Trustee and/or his counsel on February 9, 1999.

36. The Joint Liquidators did not provide the Trustee with sufficient information from which he could have filed claims on behalf of the English Customer Creditors until May 20, 1999, nine days after the Bar Date. Only the schedule dated May 20, 1999 (the "May schedule") incorporated the actual claim forms submitted to the Joint Liquidators. The May schedule included the names and addresses of the Creditors and the amounts of the claims. For the first time there would have been sufficient information for the Trustee to have utilized should he have determined to file claims on behalf of the English Customer Creditors.

## CONCLUSIONS OF LAW

### I—THE MOTIONS OF THE JOINT LIQUIDATORS AND GROUP A ENGLISH CREDITORS

#### (A) *The Joint Liquidators Are Not Trustees Of This Estate.*

##### (i) *Standing.*

The Joint Liquidators argue that they have standing to act on behalf of the English Customer Creditors pursuant to Section 501 of the Bankruptcy Code, Title 11, U.S.C. ("Code") and Bankruptcy Rule 3004 because they are in effect "trustees" under the Code. Section 501 provides in relevant part that "a creditor or indenture trustee may file a proof of claim." 11 U.S.C. § 501.

Bankruptcy Rule 3004 provides in relevant part:

> If a creditor fails to file a proof of claim on or before the first date set for the

meeting of creditors called pursuant to § 341(a) of the Code, the debtor or trustee may do so in the name of the creditor, within 30 days after the expiration of the time for filing claims prescribed by Rule 3002(c) or 3003(c).

Fed. R. Bankr.P. 3004. The Joint Liquidators contend that they qualify as trustees under Rule 3004 because they are court-appointed representatives of the U.K. ancillary estate. Neither Code § 501 nor Bankruptcy Rule 3004 confer standing to the Joint Liquidators to object to the settlement agreement or to file claims on behalf of English Customer Creditors.

The term "trustee" is not defined in § 101 of the Code. Section 321 provides:

a person may serve as trustee in a case under this title only if such person is an individual that is competent to perform the duties of trustee, and . . . resides or has an office in the judicial district within which the case is pending, or in any judicial district adjacent to such district.

Since neither Joint Liquidator resides or has an office within this judicial district, the Joint Liquidators are not eligible to serve as trustees.

▪ The court in *In re A. Tarricone, Inc.*, 80 B.R. 21, 23 (Bankr.S.D.N.Y.1987) addressed the issue of whether a foreign representative is considered a trustee under the Code in the context of the trustee's avoidance powers. The court explained that a foreign representative may not as-

sert trustee avoidance powers created by the Code, but that under § 304, the representative may assert those avoiding powers vested in him by the law applicable to the foreign estate.[6] "Had Congress desired to vest a foreign representative with those domestic powers, it would have said so directly." *Id., citing, Metzeler v. Bouchard Transportation Co., Inc. (In re Metzeler),* 78 B.R. 674, 677 (Bankr.S.D.N.Y. 1987). Therefore the Joint Liquidators do not constitute "trustees" under the Code because they were not appointed under the Code. Rather, they were appointed under the laws of the U.K. by an English court.

Although there is no case law addressing whether a foreign Liquidator in a proceeding ancillary to a U.S. bankruptcy proceeding has standing under the Code, courts have indicated that foreign representatives do not have rights under the Bankruptcy Code outside of those rights set forth in §§ 303, 304, 305 and 306.[7] For example, courts have held that when a foreign debtor files a main proceeding outside of the U.S. and the foreign representative wishes to use trustee powers to avoid preferential transfers to entities in the U.S., the foreign representative must initiate an involuntary Chapter 7 under § 303 in which a Chapter 7 trustee is appointed to control the debtor's U.S. assets and initiate avoidance actions. *In the Matter of Axona Int'l Credit & Commerce, Ltd.,* 88 B.R. 597 (Bankr.S.D.N.Y.1988); *In re Metzeler,* 78 B.R. at 677.

---

**6.** Section 304 provides in relevant part: "A case ancillary to a foreign proceeding is commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative". 11 U.S.C. § 304.

**7.** Section 303 permits a foreign representative to commence an involuntary case against a debtor in order to administer assets in this country. Section 304 permits a foreign representative to commence a case in the U.S. ancillary to a foreign proceeding to prevent

dismemberment by local creditors of assets located in the U.S.C. § 305 permits a foreign representative to seek dismissal of a case in the U.S. on the grounds that a foreign proceeding is pending. Section 306 states that an appearance in a bankruptcy court by a foreign representative in connection with a petition or request under §§ 303, 304, or 305 does *not* submit the representative to the jurisdiction of a U.S. court for any other purpose.

■ Courts have also stated that a foreign representative in a foreign proceeding who files an ancillary case in the U.S. under § 304 does not create a separate estate in the U.S. Moreover, the filing does not trigger the automatic stay or the other rights that are usually available under the Code. The foreign representative has only the powers granted to him by the laws of the foreign jurisdiction. *Vesta Fire Ins. Corp. v. New Cap Reinsurance Corp., Ltd.,* 244 B.R. 209, 213, 218–19 (S.D.N.Y.2000) (an ancillary proceeding does not create an estate nor does it confer the full panoply of rights that would otherwise be available to a debtor or trustee; and Australian law applied when U.S. proceeding was ancillary to proceeding in Australia); *In re MMG L.L.C.,* 256 B.R. 544, 549 (Bankr. S.D.N.Y.2000) (a § 304 proceeding is not full blown case and does not trigger automatic stay); *Petition of Brierley,* 145 B.R. 151, 162–63 (Bankr.S.D.N.Y.1992) (U.S. court will apply U.K. law in a § 304 proceeding ancillary to proceeding in U.K.).

■ In addition, the Joint Liquidators do not have standing as foreign representatives because they do not fit within the Code's definition of a foreign representative. Foreign representatives are only given rights in U.S. bankruptcy courts pursuant to §§ 303, 304, 305 and 306. The position taken by the Joint Liquidators does not fall within any of those sections. Further, the Code defines the term "foreign representative" in § 101(24) as a "duly selected trustee, administrator, or other representative of an estate in a foreign proceeding." A foreign proceeding is a *main* proceeding in a foreign country where the debtor's domicile, residence, principal place of business, or principal assets were located at the time of commencement of the proceeding. 11 U.S.C. § 101(23). Although the Debtor had significant assets and a place of business in the U.K., its principal place of business and principal assets were located in the U.S. which was where this main proceeding was filed. The proceeding in the U.K. is only ancillary to this proceeding. There are no cases which have addressed the question whether a foreign ancillary trustee has standing in the U.S. main proceeding. Collier, however, in its treatise, notes that an ancillary proceeding in a foreign jurisdiction is excluded from the Code definition of a foreign proceeding. 2 Lawrence P. King, *Collier on Bankruptcy* ¶ 304.02[1] (15th ed.2001). The Code provisions conferring rights within the U.S. proceeding for foreign representatives do not apply to foreign liquidators appointed by a foreign court to act in a foreign proceeding which is ancillary to the main U.S. proceeding.

(B) *The Joint Liquidators Are Not Agents of the English Customer Creditors.*

■ The Joint Liquidators also contend that they have standing as authorized agents of the English Customer Creditors pursuant to Bankruptcy Rule 3001(b). Rule 3001(b) provides "a proof of claim shall be executed by the creditor or the creditor's authorized agent except as provided in Rules 3004 and 3005." Fed. R. Bankr.P. 3001(b). The Liquidators argue that they are authorized agents of the English Customer Creditors by way of their position as Joint Liquidators. This Court disagrees. A liquidator is an officer and agent of the English courts appointed by the English courts as defined by the court. U.K. insolvency law provides that a liquidator is subject to control of the court and does not state that creditors may control the actions of a liquidator. The Insolvency Act of 1986, ch. VII, § 167(3) (Eng.). The Liquidators' position under their appointment precludes them from as-

serting that they are agents of the English Customer Creditors.[8]

### (C) *The Submissions Do Not Constitute Informal Proofs Of Claim.*

■ Assuming *arguendo* that the Liquidators did submit schedules on behalf of the English Customer Creditors, these submissions are not informal proofs of claim. The Liquidators, Group A English Creditors and Jamie Macleod contend that the Liquidators submitted informal proofs of claim on behalf of the English Customer Creditors prior to the bar date, and that the Liquidators should now be permitted to amend the proofs so that the creditors can participate *pari passu* in the interim distribution from the Debtor's estate.[9] This argument is without merit.

■ "The informal proof of claim doctrine is an equitable doctrine developed by the courts to ameliorate the strict enforcement of the claims bar date." *In re Wigoda,* 234 B.R. 413, 415 (Bankr.N.D.Ill.1999)(internal citation omitted). The Seventh Circuit has addressed issues related to the informal proof of claim doctrine. *See In the Matter of Plunkett,* 82 F.3d 738 (7th Cir.1996); *In the Matter of De Vries Grain & Fertilizer, Inc.,* 12 F.3d 101 (7th Cir.1993); *In the Matter of Stoecker,* 5 F.3d 1022 (7th Cir. 1993); *In the Matter of Unroe,* 937 F.2d 346 (7th Cir.1991); *In the Matter of Ev-*

*anston Motor Co., Inc.,* 735 F.2d 1029 (7th Cir.1984); and *In the Matter of Wilkens,* 731 F.2d 462 (7th Cir.1984). It has not, however, articulated the requirements necessary to file an informal proof of claim.

■ The Seventh Circuit has stated the general rule "that a claim [either formal or informal] arises where the creditor evidences an intent to assert its claim against the debtor." *In the Matter of Wilkens,* 731 F.2d at 465. "Mere knowledge of the existence of the claim by the debtor, trustee, or bankruptcy court is insufficient." *Id.* (internal citation omitted). "A creditor can manifest its intent to hold a debtor liable in many ways, and the particular facts of a case will determine whether such a *de facto* claim has been made." *Id.* Therefore, the only explicit rule in the Seventh Circuit, regarding an informal proof of claim, is that the claim evidence an intent to hold the debtor liable. In *Evanston Motor Co., Inc.,* the Seventh Circuit, dealing with an earlier version of Rule 5005, held that a creditor purporting to have filed an informal proof of claim must have intended to file the document with the court for it to be deemed filed pursuant to Rule 5005. *See* discussion *infra.*

Bankruptcy courts in this district have not agreed on a uniform set of requirements for an informal proof of claim. One

8. The Liquidators argue that the English Creditors impliedly authorized them to act as agents of the Creditors when they failed to object to the Joint Liquidators' letter (Joint Exhibit 11) stating that the Liquidators would act on behalf of the English Customer Creditors. This argument fails because while implied authority implied by an act of an agent may determine the scope of an agency relationship, it is not proof of creation of the agency.

9. The Court will address the Group A English Creditors' motion to allow informal proofs of

claim along with the Joint Liquidators' motion because both the Liquidators and the Group A English Creditors contend that the claim forms submitted to the Joint Liquidators prior to the Bar Date are informal proofs of claim. These claim forms were never admitted into evidence and are not a part of the record. Jamie Macleod's motion will also be addressed with the Joint Liquidators' motion because he joined in the Liquidators' motion and adopted the Liquidators' briefs.

bankruptcy court, following the Eleventh Circuit, held that an adversary complaint, if filed prior to the bar date for claims, may be considered as an informal proof of claim, iterating the requirements for such an informal proof of claim; as it must: 1) have been timely filed with the bankruptcy court and become a part of the record; 2) state the existence and nature of the debt; 3) state the amount of the creditor's claim; and 4) evidence creditor's intent to hold the debtor liable. *In re Wigoda,* 234 B.R. 413, 415 (Bankr.N.D.Ill.1999) (J. Schwartz). Another bankruptcy court held that a writing may be deemed an informal proof of claim only where it makes a demand for payment on the debtor's estate and reflects an intent to hold the debtor liable for the debt. *In the Matter of Burrell,* 85 B.R. 799, 801 (Bankr. N.D.Ill.1988) (J. Ginsberg), *citing, In re Evanston Motor Co.,* 26 B.R. 998, 1001 (N.D.Ill.1983), *aff'd.,* 735 F.2d 1029 (7th Cir.1984).[10]

Recent decisions in the Fifth, Sixth and Tenth Circuits have articulated a five part test to determine whether a writing constitutes an informal proof of claim. *Barlow v. M.J. Waterman & Assoc., Inc. (In re M.J. Waterman & Assoc., Inc.),* 227 F.3d 604, 609 (6th Cir.2000); *Nikoloutsos v. Nikoloutsos (In the Matter of Nikoloutsos ),* 199 F.3d 233, 236 (5th Cir.2000); *Clark v. Valley Fed. Sav. & Loan Assoc. (In re Reliance Equities, Inc.),* 966 F.2d 1338, 1344 (10th Cir.1992). The test requires that 1) the claim must be in writing; 2) the writing must contain a demand by the creditor on the debtor's estate; 3) the writing must evidence an intent to hold the debtor liable for such a debt; 4) the writing must be filed with the bankruptcy

court; and 5) based upon the facts of the case, allowance of the claim must be equitable under the circumstances. *Id.*

The Eleventh Circuit uses a similar test and requires that the document apprise the bankruptcy court of the nature and amount of the claim as well as evidence an intent to hold the debtor liable. *The Charter Co. v. Dioxin Claimants (In re the Charter Co.),* 876 F.2d 861, 864 (11th Cir. 1989); *Biscayne 21 Condominium Assoc., Inc. v. South Atlantic Financial Corp. (In re South Atlantic Financial Corp.),* 767 F.2d 814, 819 (11th Cir.1985). The Eleventh Circuit, like the Fifth, Sixth and Tenth Circuits, requires that the informal claim be filed in the bankruptcy court. The Eleventh Circuit has stated that "before a court will allow a party to file an amended proof of claim . . . there must be something filed in the bankruptcy court capable of being amended". *In re South Atlantic Financial Corp.,* 767 F.2d at 819 (internal citation omitted).

The court filing requirement: 1) puts the court on notice of the universe of claims; 2) facilitates the orderly disposition of claims by alerting creditors of the potential claim; and 3) creates an informal claim in the court record that can be amended after the bar date. *See In the Matter of Nikoloutsos,* 199 F.3d at 236.

Unlike the tests in the Fifth, Sixth, Tenth and Eleventh Circuits, neither the Eighth or Ninth Circuits require that the creditor file the informal claim in the bankruptcy court. The Eighth Circuit has held that an informal claim must disclose facts showing an assertion of a claim against the estate and an intention by the claimant to

---

**10.** In its opinion affirming the district court, the Seventh Circuit did not address whether the district court used the proper test regarding the informal proof of claim. Instead, the appellate court stated "for purposes of this appeal, we accept the bankruptcy judge's determination that the August 18, 1980 letter may be interpreted as a proof of claim . . .". *In re Evanston,* 735 F.2d at 1031.

share in its assets. *First Am. Bank & Trust of Minot v. Butler Mach. Co. (In re Haugen Const. Serv., Inc.)*, 876 F.2d 681, 682 (8th Cir.1989). The claim, however, need not be filed with the bankruptcy court. *Id.* The test used by the Ninth Circuit requires that the claim state an explicit demand showing the nature and amount of the claim against the estate, and evidence an intent to hold the debtor liable. *Sambo's Restaurants, Inc. v. Wheeler (In re Sambo's Restaurants, Inc.)*, 754 F.2d 811, 815 (9th Cir.1985). The Ninth Circuit also does not require that informal claims be filed in the bankruptcy court. *Id.* at 816.

The Joint Liquidators submitted schedules of the English Customer Creditors' claims in February 1999 and again in April of 1999 (prior to the May 11, 1999 Bar Date). The Joint Liquidators contend that these schedules constitute informal proofs of claim capable of amendment. The first issue is whether the schedules were filed in the bankruptcy court as required by the majority of the circuits. Under the rule adopted in those circuits, a failure to file the schedules in the bankruptcy court would, by itself, be fatal to the Joint Liquidators' motion.

### (i) *Submission of Schedules to the Trustee Does Not Constitute a Filing Under Rule 5005(c).*

██ The Joint Liquidators claim that their submission of the schedules to the Trustee should be deemed to have been filed in the bankruptcy court. The Liquidators rely on Fed. R. Bankr.P. 5005(c) which provides in relevant part:

A paper intended to be filed with the clerk but erroneously delivered to the United States Trustee, the trustee, the attorney for the trustee, a bankruptcy judge, a district judge, or the clerk of the district court shall, after the date of its receipt has been noted thereon, be transmitted forthwith to the clerk of the bankruptcy court. In the interest of justice, the court may order that a paper erroneously delivered shall be deemed filed with the clerk as of the date of its original delivery.

The Liquidators argue that the schedules were erroneously delivered to the Trustee and that the Court should deem the schedules filed with the bankruptcy clerk as of the dates they were submitted to the Trustee.

The Seventh Circuit has held that former Rule 509, the provisions of which are the same as Rule 5005, does not apply unless the creditor intended to file the documents with the bankruptcy court and erroneously delivered the documents to a trustee or other party named in Rule 5005(c). *In the Matter of Evanston Motor Co., Inc.*, 735 F.2d 1029, 1032 (7th Cir. 1984). In *Evanston*, the Chapter 11 trustee requested documentation from a creditor evidencing the creditor's secured position. An attorney representing the creditor responded with a letter stating the balance of the indebtedness and enclosed evidence of a security interest in a land trust. Subsequently, the case was converted to Chapter 7 and the secured creditor was served with notice of the conversion. After the bar date, the creditor realized it was undersecured and contended that the letter to the trustee constituted an informal proof of claim.

The Seventh Circuit held that Rule 509(c) requires a misdelivery, a finding that the creditor had intended to deliver the letter to the court and inadvertently delivered it to the trustee. It found no evidence to support an erroneous delivery and stated:

[The bankruptcy court's] conclusion appears to have been based on the prior practice under General Order 21, and on an expansive view of the purpose of Rule

509(c). In contrast, the current practice ... requires a misdelivery. [The creditor's letter], however, was addressed solely to the trustee and delivered solely to the trustee. While delivery of this proof of claim to the trustee may have resulted from an error in judgment, there was no erroneous delivery under the plain meaning of Rule 509(c).

*In the Matter of Evanston Motor Co., Inc.,* 735 F.2d at 1032.

Here too, neither the Joint Liquidators nor the English Customer Creditors claim that the February and April schedules were erroneously delivered to the Trustee rather than the bankruptcy court. In fact, one of the former Joint Liquidators, Finbarr O'Connell ("Mr. O'Connell"), testified that he intended to submit the schedules to the Trustee in response to the Trustee's request for them. No party contends that Mr. O'Connell had intended to deliver the schedules to the court and instead misdelivered them to the Trustee. Therefore, under *Evanston,* Rule 5005(c) does not apply in this case and the submission to the Trustee is not deemed filed in the bankruptcy court.

The May schedules were also delivered to the Trustee and were not filed in the bankruptcy court. The Joint Liquidators submitted schedules to the Trustee on May 20, 1999, nine days after the Bar Date. (*See* Joint Exhibit 45). Even the Eighth and Ninth Circuits require that the informal proof of claim be submitted prior to the bar date.

#### (ii) Section 501 and Rule 3004.

The Liquidators also assert that the May schedules should be deemed filed in the bankruptcy court pursuant to Code § 501 and Rule 3004. Section 501 provides in relevant part: "if a creditor does not timely file a proof of such creditor's claim, the debtor or trustee may file a proof of such claim." Rule 3004 provides:

If a creditor fails to file a proof of claim on or before the first sate set for the meeting of creditors called pursuant to § 341(a) of the Code, the debtor or trustee may do so in the name of the creditor, within 30 days after the expiration of the time for filing claims prescribed by Rule 3002(c) or 3003(c), whichever is applicable.

Fed. R. Bankr.P. 3004.

None of the English Customer Creditors, with the exception of the Group A English Creditors, filed claims with this Court prior to this proceeding. The Group A English Creditors filed claims with this Court on May 24, 1999, thirteen days after the Bar Date.

The Joint Liquidators also argue that the Trustee was *obligated* to file the February, April and May schedules with the Court. Section 501(c) provides that the debtor or trustee may file a claim on the creditor's behalf if the creditor fails to timely file its claim. Rule 3004 sets forth the requirements for such a filing:

If a creditor fails to file a proof of claim on or before the first date set for the meeting of creditors ... the debtor or trustee may do so in the name of the creditor, within 30 days after the expiration of the time for filing claims.

Fed. R. Bankr.P. 3004. The Joint Liquidators contend that since the Liquidators failed to file the English Creditors' schedules before the first date set for the meeting of creditors on February 10, 1999, the Trustee should have filed the schedules with the Court within 30 days of the May 11, 1999 Bar Date. The Liquidators reason that the Trustee was obliged to file the claims because the Trustee knew that the Liquidators had advised the creditors to file claims only with the Liquidators. The Liquidators also allege that the Trustee

should have filed the claims for the creditors because he was aware that the English Customer Creditors were looking to this proceeding to satisfy the deficit customer claims.

This argument fails because it is contrary to the permissive language used in Rule 3004. The trustee or debtor *may* file claims on behalf of creditors. The trustee or debtor is not bound to file such claims even if the debtor or trustee knows that the creditors are relying on him to do so. As stated by the Seventh Circuit:

> [t]he drafters chose "may" rather than "must" to avoid any implication that a debtor must file a proof of claim on behalf of a creditor. "May file within ..." means that the person need not file, but must act within the time specified if he elects to file.

*In the Matter of Danielson,* 981 F.2d 296, 298 (7th Cir.1992), *rev'd on other grounds,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). *Accord, In re Nettles,* 251 B.R. 899, 901 (Bankr.M.D.Fla.2000); *In re Jones,* 238 B.R. 338, 342 (Bankr.W.D.Mich. 1999), *aff'd, U.S. v. Jones,* No. 1:99–CV–629, 2000 WL 1175717 (W.D.Mich. June 28, 2000).

#### (iii) *The February, April and May Submissions*

The February and April schedules are simply a summary list compiled from the Debtor's records, do not contain a demand by the English Customer Creditors on the estate, and do not evidence the Creditors' intent to hold the estate liable. Mr. O'Connell testified that he traveled from London to Chicago on February 9, 1999 and gave the Trustee the February sched-

ules (three documents at Joint Exhibits 14, 18 and 19) containing the names and addresses of all of the creditors and the amounts that were owed to the creditors as of that date. (Transcript, Vol. II at 42 and 117–18). The schedule at Joint Exhibit 14 is not only difficult to read but the claim calculations are not an accurate reflection of the creditors' demands on the estate or the creditors' intent to hold the estate liable. The claim amounts do not incorporate the "claims" English Customer Creditors submitted to the Liquidators and instead are based on the books and records of the Debtor.[11] (Transcript, Vol. II at 119). Therefore, even if one could read Exhibit 14, it does not constitute an informal claim.

The schedule at Joint Exhibit 18 entitled "Company Creditors" is also not an informal claim. First, the schedule is incomplete. Some creditors are not listed and some addresses are excluded. Also Mr. O'Connell admits that the amounts of debt stated in the schedule are from the Debtor's financial records. Again, this schedule is not a product of information provided by the creditors. Therefore, it does not evidence the creditors' demands on the estate or the creditors' intent to hold the estate liable. It merely evidences the Liquidators' estimate of potential claims.

The schedule at Joint Exhibit 19 is a list of customer names, addresses and phone numbers. It does not contain any claim amounts. It is reasonable to conclude that this list combined with the schedules in Exhibits 14 and 18 put the Trustee on notice only of the Joint Liquidators' estimate of potential claims against the estate. There is no evidence, however, that the

---

11. The "claims" submitted to the Liquidators were claim forms created by the Liquidators for their own records when they were the Provisional Liquidators. When they were appointed Liquidators they asked each creditor to submit to them a "proof of debt". The Liquidators do not submit the proofs of debt to the Court until the end of the case. 2 Lawrence P. King, *Collier International Business Insolvency Guide,* § 21.04[4] (2000).

English Customer Creditors endorsed, adopted or played any role in creating these schedules. The claim forms or proofs of debt submitted to the Liquidators were not incorporated into the schedules and not one creditor testified that he or she had communicated his or her claims to the Liquidators. The schedules that Mr. O'Connell submitted to the Trustee on February 9, 1999 do not contain the English Customer Creditors' demands on the estate nor do they evidence the English Customer Creditors' intent to hold the Debtor liable.

The April schedules also do not constitute an informal proof of claim. On April 16, 1999, the Joint Liquidators faxed the Trustee a schedule of clients whose claims had been "agreed" and a proposed first interim distribution. (*See* Joint Exhibit 38). At trial, Mr. O'Connell described the agreement process:

> [The Liquidators] ask the creditors to submit a claim to [them] and the back-up information supporting that claim and then adjudicate or examine it in comparison with the books or records of the company ... If it is agreed, then the creditor can receive a percentage return ... If it is not agreed, then [the liquidators] keep going until it is agreed and then [the creditors] get their percentage dividend.

(Transcript, Vol. II at 77). Mr. O'Connell compiled the April schedule by reconciling the information in the creditors' claim forms with the company records. Therefore the April schedule is a product of Mr. O'Connell's analysis of the Debtor's records along with the creditors' claims. The schedule is not solely based on the information provided by the creditors and therefore does not evidence the creditors' intent or demand on the estate.

The May schedule, sent to the Trustee on May 20, 1999, after the bar date, includes the creditors' names and addresses and the amount of the claims that they filed with the Liquidators. The May schedule is the only one that incorporates the actual claims submitted by the creditors. If this schedule had been timely filed with the court on behalf of the Creditors, it may have constituted an informal proof of claim.

#### (iv) *The Trustee's Motion*

The Joint Liquidators also submit that the Trustee's motion for authority to use estate assets to pay customer claims in full, filed with this Court on April 6, 1999, constitutes an informal claim because it demonstrates that the Trustee was aware of the amount, nature and existence of the English Customer Creditors' claims, and the intent of the English creditors to hold the estate liable. (Joint Liquidators' Proposed Conclusion of Law, ¶ 23). This Court disagrees. First, the Trustee's awareness is not relevant to whether an informal claim was filed because "mere knowledge of the existence of the claim by the debtor, trustee or bankruptcy court is insufficient [to constitute an informal claim]." *In the Matter of Wilkens*, 731 F.2d at 465. Also the motion was not an assertion of actual claims but was merely the Trustee's estimate of potential claims. In the motion, the Trustee estimates that the potential English Customer Claims will be $4.3 million. This motion did not make a demand on the estate, nor did it evidence the English Customer Creditors' intention to hold the estate liable. In support of his motion to pay Customer Creditors, the Trustee sought to put the Court on notice of the dollar amount of possible customer claims. The motion was not intended to be a reflection of the actual English Customer claims.

Inasmuch as the Court has concluded that none of the schedules submitted to the Chapter 7 Trustee constituted timely

submitted informal claims, the Court need not address whether such claims would have been capable of amendment.

### (v) *The Alleged Agreement*

▆▆▆▆ The Joint Liquidators assert, in the alternative, that if the Trustee was not obligated to file the schedules by Rule 3004, that the Trustee was obligated to file them because he agreed that he would do so. The Joint Liquidators argue, that by virtue of his agreement with the Liquidators, the Trustee is estopped from claiming that no informal proofs of claim were filed in the bankruptcy court.[12] "A claim of equitable estoppel exists where a person, by his or her statements or conduct, induces a second person to rely, to his or her detriment, on the statements or conduct of the first person." *Blisset v. Blisset*, 123 Ill.2d 161, 169, 526 N.E.2d 125, 128, 121 Ill.Dec. 931, 934 (1988) (internal citation omitted). The party asserting the estoppel must have reasonably relied upon the acts or representations of the other and have no knowledge or convenient means of knowing the true facts. *Id.* The purpose of estoppel is to prevent a party from benefitting from its own misrepresentations. *In re Handy Andy Improvement Centers, Inc.*, No. 95 B 21655, 1997 WL 401583, at *3 (Bankr.N.D.Ill. July 9, 1997) (internal citation omitted).

▆▆▆▆ The Joint Liquidators contend that the Trustee represented to them that he or his attorneys would file proofs of claim on behalf of the English Creditors. The Trustee denies any such representation. The Liquidators maintain that the Joint Liquidators relied on the Trustee's representation to the detriment of the En-

glish Creditors. The Trustee had no duty to advise the Liquidators concerning United States law. Further, the Joint Liquidators consulted and relied upon solicitors from the London office of Stephenson Harwood. The English solicitors should have known that the Liquidators needed advice on U.S. law and they should have advised the Liquidators to retain U.S. bankruptcy counsel.

▆▆▆▆ Additionally, only the individual creditors have standing to complain that they relied on any assertions of the Trustee. No party, however, presented any evidence that the English Creditors' relied on the Trustee's representations as allegedly reported to them. None of the English Creditors testified at trial. Because the Joint Liquidators' estoppel argument lacks evidentiary support, the Trustee is not estopped. Additionally, estopping the Trustee from objecting to the Joint Liquidators' motion to amend informal claims would not change the requirements of the Code.

The Joint Liquidators also ignore the fact that their cross-motion to amend informal claims is opposed by other creditors. (*See* Fortis Bank's response to the Joint Liquidators' cross-motion and the Walsh Claimants' objection to the Liquidators' cross-motion). The Joint Liquidators do not allege that either the Walsh Claimants or Fortis Bank performed any acts rising to the level of an estoppel. These creditors are not bound by any action of the Trustee.

### (D) *Excusable Neglect*

▆▆▆▆ The Joint Liquidators also argue that they should be granted additional time to file proofs of claim on behalf of the

---

12. The Joint Liquidators do not specifically allege equitable estoppel in their motion to amend informal claims or in their proposed conclusions of law. They do, however, state in their proposed conclusions of law that "[i]n light of this agreement, and the Trustee's knowledge that the Liquidators were so advising the English creditors ... the Trustee was obligated to file proofs of claims on behalf of these creditors." (Joint Liquidators' Proposed Conclusions of Law, ¶ 36).

English Customers because the Joint Liquidators' failure to timely file within Fed. R. Bankr.P. 3004 was due to excusable neglect. Fed. R. Bankr.P. 9006(b)(1) states in pertinent part:

> Except as provided in paragraphs (2) and (3) of this subdivision, when an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

Fed. R. Bankr.P. 3004 provides in relevant part:

> If a creditor fails to file a proof of claim on or before the first date set for the meeting of creditors called pursuant to § 341(a) of the Code, the debtor or trustee may do so in the name of the creditor, within 30 days after the expiration of the time for filing claims prescribed by Rule 3002(c).

Fed.R.Civ.P. 3004 permits either the debtor or trustee to file a claim on behalf of a creditor.

 The Joint Liquidators contend that the court should enlarge the 30–day period in which a debtor or trustee may file on behalf of a creditor under Rule 3004 so that the Joint Liquidators may file proofs of claim on behalf of the English Customer Creditors. Generally, Rule 9006(b)(1) does not apply in Chapter 7 cases. *See Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. Partnership,* 507 U.S. 380, 389, 113 S.Ct. 1489, 1495, 123 L.Ed.2d 74 (1993). At least one court, however, has held that Rule 9006(b)(1) may apply in a Chapter 7 if the debtor or trustee is seeking to file on behalf of a creditor pursuant to Rule 3004. *See In re Byrne,* 162 B.R. 816, 818 (Bankr.W.D.Wis.

1993). Rule 9006(b)(3) lists the rules in which the time period may not be enlarged due to excusable neglect; this list does not include Rule 3004. The *Byrne* court reasons, that since 9006(b)(3) does not list Rule 3004, Rule 9006(b)(1) is applicable to enlarge the time to file under Rule 3004. This Court, however, need not consider *Byrne* because the Joint Liquidators are not trustees or debtors within Rule 3004, and neither the Trustee nor the Debtor seeks to file a claim on behalf of the English Customer Creditors.

## II *THE PROPOSED SETTLEMENT*

 The next and ultimate issue at hand, is whether the Trustee's proposed settlement should be approved by the Court. Bankruptcy Rule 9019(a) authorizes this Court to approve a settlement or compromise and provides in pertinent part: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." The Debtor's creditors principally consist of customers as that term is defined in 11 U.S.C. § 761(9) and general unsecured creditors. Fortis Bank is the Debtor's largest non-customer unsecured creditor. It filed a $4,757,674.58 claim against the Debtor's estate. Harris Bank filed claims in the amount of $780,600.80. Both Fortis Bank and Harris Bank have agreed to subordinate 50% of their claims against the estate. The Walsh Claimants are the Debtor's largest customer creditors. They filed claims in the amount of $3,377,220.90. Additional customer claims in the amount of $1,857,995.88 were timely filed. Timely non-customer unsecured claims were filed in the amount of $564,995.71. The Trustee proposes to settle all of the timely-filed unsubordinated claims and distribute no less than $2,025,000 to creditors. The agreement also proposes the creation of an estate reserve for litigation funds in the

amount of $350,000 and a reserve for the payment of administrative expense claims (the fees of the Trustee and his counsel) in the amount of $470,000.

A bankruptcy court should approve a settlement only if it is in the best interests of the estate. *In re American Reserve Corp.*, 841 F.2d 159, 161 (7th Cir. 1987). "This determination requires a comparison of the settlement's terms with the litigation's probable costs and probable benefits." *Grochocinski v. Kennedy (In re Miller)*, 148 B.R. 510, 516 (Bankr.N.D.Ill. 1992) (internal citation omitted). "In making this comparison the bankruptcy judge should consider the litigation's probable costs and probability of success, the litigation's complexity, and the litigation's attendant expense, inconvenience, and delay." *Id.*

A settlement of the Griffin case and each related controversy is in the best interests of the estate. This case was filed more than two years ago in 1998. In February of 2000, this Court entered a Memorandum Opinion and Order denying the Trustee's motion to make an interim distribution to Customer Creditors, in which the Court found that 17 C.F.R. 190.08(a)(1)(ii)(J) which provided for priority payment to Customer Creditors from all assets of the estate was invalid.[13] The Trustee and several other parties filed a timely appeal that is currently pending in the United States District Court for the Northern District of Illinois. If this Court's decision is overturned, the unsecured customer creditors will take first and the general unsecured creditors including Fortis Bank and Harris Bank will receive nothing. If this Court's decision is affirmed, then all unsecured creditors will share in the proceeds of the estate on a *pro rata* basis. This Court's decision involves an issue of first impression which is likely to be appealed ultimately to the Supreme Court.

Due to the costs of litigation and the likelihood for substantial delay, it is in each claimant's best interest to settle its claim against the estate. Fortis Bank and Harris Bank each agreed to subordinate 50% of their claims. In addition, a quick resolution ensures that the Customer Creditors receive funds on a more timely basis than they would if they had to wait for the completion of at least one, if not two, appeals. The cost of continued litigation could substantially erode the remaining assets of the estate.

The Trustee moves that the Court find that § 726(a)(2)(C)(ii) of the Code applies to this interim distribution. Section 726(a)(2)(C)(ii) provides in relevant part:

(a)Except as provided in section 510 of this title, property of the estate shall be distributed (2) second, in payment of any allowed secured claim, other than a claim of the kind specified in paragraph (1), (3), or (4) of this subsection, proof of which is(C) tardily filed under section 501(a) of this title, if(I) *the creditor that holds such a claim did not have notice or actual knowledge of the case* in time for timely filing of a proof of such claim under section 501(a) of this title; and (ii) proof of such claim is filed in time to permit payment of such claim. (emphasis added).

The Court finds that § 726(a)(2)(C)(ii) applies to preclude all creditors before the court from sharing in any distribution made.

The settlement agreement is conditioned on this Court allowing the Walsh Claimants and Fortis Bank a $25,000 administrative expense priority claim pursuant to § 503(b)(3)(D) of the Code for their substantial contributions to the case. The

---

**13.** *See In re Griffin Trading Co.,* 245 B.R. 291 (Bankr.N.D.Ill.2000).

CFTC has objected to any such allowance. The Trustee asserts that both parties have spent time and incurred substantial expense in assisting the Trustee in negotiating this settlement agreement. Section 503(b)(3)(D) provides in relevant part:

> After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title including(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection incurred by(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title.

This provision explicitly limits its application to chapters 9 and 11. *See In re Energy Cooperative, Inc.*, 95 B.R. 961, 964 (Bankr.N.D.Ill.1988). The Walsh Claimants and Fortis Bank have stated on the record that they are willing to forego the award. The CFTC's objection will be sustained.

### CONCLUSION

The Joint Liquidators are not trustees of this estate and they are not authorized agents of the English Customer Creditors. Their submissions to the Trustee and the Trustee's motions to this Court do not constitute informal proofs of claim capable of amendment. The excusable neglect exception under 9006(b)(1) does not apply to Chapter 7 cases. Rule 3004 does not expand the excusable neglect standard to this case since the Joint Liquidators are not trustees within Rule 3004.

For the foregoing reasons, the Joint Liquidators' opposition to the Trustee's motion to authorize the settlement agreement is overruled and the Joint Liquidators' motion to amend informal proofs of claim is denied. The Group A English Customer Creditors' and Jamie Macleod's motion to allow amended informal proofs of claim is denied.

The Trustee's motion to authorize the settlement agreement is granted in part and denied in part. The Trustee may make an interim distribution to unsecured customer and non-customer timely-filed claimants. 11 U.S.C. § 726(a)(2)(C) will apply to this interim distribution to bar creditors with knowledge from sharing in the distribution. The request that the Walsh Claimants and Fortis Bank receive a $25,000 administrative expense priority claim pursuant to § 503(b)(3)(D) is denied.

### ORDER

This matter came before the Court on the Motion of Leroy G. Inskeep, as Chapter 7 trustee herein, for the entry of an order withdrawing the Trustee's Combined Application to Retain and to Allow Compensation and Reimbursement of Expenses to Special Counsel Stephenson Harwood (the "Motion"); due and proper notice having been served and the Court being advised in the premises,

IT IS HEREBY ORDERED that the Motion is granted; the Court's memorandum opinion at paragraph 21(d) is hereby modified to reflect the entry hereof.